UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X
                                    :       CASE NO. 04-B-41105 (JMP)
In Re                               :       CHAPTER 11
                                    :
        **INGRID OLSEN**             :
                                    :
                    Debtor           :
---------------------------------------------------X

## MEMORANDUM DECISION REGARDING (I) REMAND FROM THE COURT OF APPEALS TO DETERMINE CONTENT AND MEANING OF SETTLEMENT DISCUSSIONS AND (II) DENIAL OF RECUSAL

Appearances:

REYNOLD OLSEN
P.O. Box 7022
New York, New York  10150-7022

        Appearing *pro se*

WARSHAW BURSTEIN COHEN SCHLESINGER & KUH, LLP
555 Fifth Avenue
New York, New York  10017

        Slava Hazin, Esq.

        Counsel for 419 Apartment Corp.

JAMES M. PECK
United States Bankruptcy Judge

### *Preliminary Statement*

The Debtor's husband Reynold Olsen ("Mr. Olsen") has been remarkably tenacious and occasionally outrageous[1] in his efforts to overturn an order of this Court dated February 16, 2005 (the "Settlement Order") that was supposed to reflect the terms of a "global settlement" of all claims by and between Mr. Olsen, the Debtor (his wife Ingrid Olsen) and their former landlord, 419 Apartment Corp. ("419" or the "Co-op").  Mr. Olsen's challenges to the Settlement Order have included an objection to entry of the order, an appeal of the Settlement Order to the District Court and to the Court of Appeals on multiple grounds and a separate motion (filed after the entry of District Judge Castel's decision affirming the Settlement Order) to set aside the Settlement Order on the basis of an allegedly fraudulent secured proof of claim filed in the Debtor's chapter 11 case by 419.  Following this Court's bench ruling of March 22, 2006 denying Mr. Olsen's second motion to set aside the Settlement Order, Mr. Olsen filed a Motion for Reconsideration that was denied in a Memorandum Decision dated April 24, 2006.  Mr. Olsen's appeal from that adverse ruling currently is pending in the District Court.

This remand is the latest episode in a six-year battle between the Olsens and 419, characterized by extreme hostilities between the litigants.  The current dispute grows out of the alleged disconnect between the settlement agreement reached by the parties during "off the record" settlement discussions that took place on November 9, 2004 and the release language later used in the form of the Settlement Order as entered by Bankruptcy Judge Blackshear on February 16, 2005.  Mr. Olsen asserts that the Settlement Order incorrectly includes an express

---

[1]    Mr. Olsen's filing of a recusal motion seeking to disqualify me after the scheduled start of an evidentiary hearing in this matter on December 15 is an example, and not an isolated one, of the overly zealous litigation tactics employed by Mr. Olsen.  The Court addresses Mr. Olsen's recusal motion on pp. 21-28 of this decision.

release of 419's agents and attorneys, a release that was never actually discussed by the parties and that is beyond the scope of their agreement made on November 9, 2004.  419 submits that the release of its agents and attorneys was understood, was a necessary and critical element of any settlement with the Olsens and was subsumed within the broad language ("everyone releases everyone else") used by the parties in their discussions regarding a "global" settlement.

The Court of Appeals, in a decision dated November 13, 2006, remanded to the District Court for subsequent remand to this Court the narrow question of whether the Debtor, Mr. Olsen and 419 agreed to release the Co-op's agents and attorneys during those "off the record" settlement discussions that occurred on November 9, 2004.  The parties, after conferring for more than four hours that day, reached a "global" settlement agreement that was confirmed on the record by 419's counsel, Mr. Backenroth, using language that did not explicitly mention the release of claims against 419's "agents" and/or "attorneys."  The record was "so ordered" with the understanding that Mr. Olsen's counsel thereafter would draft and submit a proposed form of Order to set forth the terms of the agreement with greater precision.

As a result of hearing testimony on December 19, 2006 from the five lawyers who participated in the "off the record" discussions, the Court concludes that the parties did not agree to a separate release of 419's agents and attorneys, although they did agree to end all litigation between the Olsens and 419.  Mr. Olsen, who chose not to testify and never put his own credibility at issue, alternatively: (i) never intended to release 419's agents and attorneys; (ii) changed his mind after the settlement was reached; or (iii) exploited an ambiguity in the language so that he could achieve the advantages of a settlement with 419 (a distribution of escrowed proceeds from the sale of his apartment) while still preserving claims against the Co-op's agents and attorneys.

Given the testimony, as described in greater detail in the findings of fact section on pages 6 through 15 of this decision, Mr. Olsen's true state of mind during the off the record discussions is both unknown and irrelevant to the outcome.[2]  The only evidence that matters for purposes of this decision is what the negotiators, acting with authority, said to each other and the legal significance of the words that they used.  Although no one uttered the words "agents" and "attorneys" that day, the parties unambiguously did agree to end all litigation between the Olsens and 419 and to release "everyone."  Because a cooperative corporation conducts its business (in contrast with maintaining and servicing its real property) through agents and attorneys, the Court finds, as explained below, that the release by the Olsens of 419 must extend to certain claims against the Co-op's agents and attorneys if the tenant-shareholders of 419 are to achieve the benefit of their bargain with the Olsens – namely an end to all litigation for which the Co-op ultimately may have to bear financial responsibility.

This decision discusses the Court's findings and conclusions with respect to the questions remanded by the Court of Appeals and disposes of a recusal request made by Mr. Olsen on December 15, 2006.

*Recent Background*

The parties are familiar with the decision of the Court of Appeals that vacated a portion of District Judge Castel's Opinion affirming the Settlement Order and remanded to this Court the task of examining the scope of agreements made by the parties in off the record discussions on November 9, 2004.  The Court of Appeals has fixed a tight deadline to decide the questions remanded for consideration, thus requiring prompt examination of the content and legal significance of these settlement discussions.

---

[2]    Mr. Olsen declares that Mr. Backenroth's statement on the record on November 9, 2004 fairly summarizes the agreement made that day, yet at the same time he seeks to void that settlement on grounds of fraud.  Mr. Olsen's clear mission is to destroy the settlement.

4

In response to the remand, this Court held a status conference on November 21, a

discovery conference on December 4, a hearing on motions filed Mr. Olsen on December 8 and

evidentiary hearings on December 15 and December 19.  Mr. Olsen has been particularly active

since this remand.  He has filed and argued a motion seeking eight separate pre-hearing rulings,

requested and participated in an informal discovery conference, conducted depositions of

witnesses, and asked for adjournments of the evidentiary hearing originally scheduled for

December 15 on three separate occasions (orally on December 8 and December 15 and in writing

on December 11).  Mr. Olsen's papers acknowledge that in certain instances an attorney has

assisted in the preparation of his submissions, although Mr. Olsen, who appears to be quite

comfortable in the role of unlicensed lawyer, represented himself *pro se* in connection with this

remand at the status conference held on November 21 and at hearings held on December 8,

December 15 and December 19.  It is doubtful that any lawyer could give Mr. Olsen more

zealous representation, but it is also doubtful that any lawyer would permit a client to routinely

make the kind of irresponsible and reckless assertions that are contained in Mr. Olsen's various

filings and communications with the Court.[3]

As a result of the combination of Mr. Olsen's claimed illness on the morning of the

scheduled evidentiary hearing with respect to the matters remanded by the Court of Appeals and

his contemporaneous filing of an affidavit seeking my recusal (the "Recusal Motion") the Court

adjourned the evidentiary from December 15 to December 19, 2006.  The hearing on December

19 lasted for the entire day, and this decision is based on the record of that hearing, a review of

---

[3]      Mr. Olsen is no stranger to litigation.  By his own estimate, he has represented himself as a *pro se* litigant
in approximately two-dozen separate lawsuits over the past forty years.  Despite his extensive experience as a *pro se*
litigator, Mr. Olsen has failed to cause electronic docketing of certain filings by submitting a computer disk to the
clerk with such filings as is required by the rules of this Court.  The Court has had to independently scan and
electronically file courtesy copies of pleadings and letters in this case.

the transcript of the hearing held on November 9, 2004 and the post-hearing written submissions

filed by Mr. Olsen and 419.

***Findings of fact with respect to the settlement negotiations on November 9, 2004***

Mr. Olsen is the husband of the Debtor, Ingrid Olsen.  In addition to his other *pro se*

litigation experience, Mr. Olsen himself has been a chapter 13 debtor in this Court on two

occasions.  His second chapter 13 case was pending at the time of the hearing on November 9,

2004 that led to the settlement discussions and the Settlement Order challenged by Mr. Olsen.

Mr. Olsen was represented by the law firm of Robinson Brog Leinwand Greene Genovese &

Gluck, P.C. in his wife's chapter 11 case during the settlement discussions and as of the date of

entry of the Settlement Order, but Mr. Olsen also was representing his own interests at that time

as a *pro se* debtor in his then pending chapter 13 case.

Mr. Olsen attended the settlement conference on November 9 and was the only non-

lawyer who participated in the settlement discussions.  The others who took part in the

discussions that are the focus of this decision are all attorneys, and they all testified during the

evidentiary hearing conducted by the Court on December 19, 2006.  These lawyer-witnesses are:

Michael Kennedy Karlson, counsel for Ingrid Olsen; A. Mitchell Greene, counsel for Mr. Olsen

in his wife's chapter 11 case; Christine Black, one of Mr. Greene's law partners (also

representing the Olsens); Bruce Weiner, litigation counsel for 419; and Abraham Backenroth,

special bankruptcy counsel for 419.

Mr. Olsen and the Debtor were involved in a protracted and extremely bitter landlord-

tenant dispute prior to commencement of the Debtor's chapter 11 case.  The parties to that

dispute were Mr. and Mrs. Olsen as tenant–shareholders of a cooperative apartment located at

419 East 57th Street in Manhattan and their landlord, 419, the cooperative corporation.  As is

typical of luxury cooperative apartments on Manhattan's East Side, 419 was governed by a board

of directors consisting of other tenant-shareholders and the day-to-day aspects of managing the

building owned by the Co-op were delegated to a managing agent retained by the board.  These

delegated management responsibilities included the collection of monthly maintenance charges

and the enforcement of the Co-op's rights arising under the proprietary lease applicable to each

apartment.

During the years leading up to the Debtor's chapter 11 cases, Mr. and Mrs. Olsen were

named in a series of state court nonpayment and holdover proceedings brought against them by

419.[4]  Bruce Weiner was the lead attorney who represented 419 in this state court litigation

against the Olsens.  Warshaw, Burstein Cohen Schlesinger & Kuh, LLP ("Warshaw Burstein")

became counsel of record for 419 when Mr. Weiner joined that law firm as a partner.  These

prepetition litigations were hotly contested, time-consuming and costly to 419, and the Co-op

incurred significant legal fees as a consequence of litigating against the Olsens.  These legal fees

represent the bulk of amounts claimed by 419 in its proof of claim filed in the Debtor's

bankruptcy case.

The prepetition litigations were terribly nasty, even by the often ugly, no holds barred

standards of New York City landlord-tenant disputes.[5]  This Court makes no findings as to the

underlying merits of any of the allegations made during this prepetition phase of the dispute

between the Olsens and 419 but notes that Mr. Olsen was accused of disruptive behavior that

---

[4]    *419 Apartment Corp. v. Olsen et al.*, Civil Court New York County (L&T Index No. 63513/00); *419 Apartment Corp. v. Olsen et al.*, Civil Court New York County (L&T Index No. 64513/00); *419 Apartment Corp. v. Olsen et al.*, Civil Court New York County (L&T Index No. 110515/00); *419 Apartment Corp. v. Olsen et al.*, Civil Court New York County (L&T Index No. 82392/02); *419 Apartment Corp. v. Olsen et al.*, Civil Court New York County (L&T Index No. 59356/03).

[5]    Allegations of abusive behavior, physical assaults, religious intolerance, and conspiracy theories challenging the integrity of the New York State Court system elevate the rancor of this dispute to an almost unprecedented level of mutual antagonism.

included a claimed physical assault by Mr. Olsen of a member of the Co-op board and Mr.

Olsen's written threat to use deadly force directed at the building's managing agent if the agent

were to enter his apartment without permission.  State Court adjudications refer to these

incidents, among others, and question Mr. Olsen's credibility and his possible motivation in

filing numerous frivolous pleadings, leading one of the New York State judges to describe Mr.

Olsen as a vexatious litigant (*see* 12/19/06 tr. at 206:6-216:25; Judge Anthony J. Fiorella

Decision/Order dated October 8, 2003 admitted into evidence as Exhibit "D" at p. 5).  These

pleadings and related correspondence filed by Mr. Olsen during his state court battle with the

Co-op include allegations of misconduct by the Co-op's attorneys who allegedly were part of a

conspiracy to harm Mr. Olsen that extended to employees of the New York State Courts.  Mr.

Olsen even brought a personal injury lawsuit against the Co-op's law firm Warshaw Burstein

(for injuries allegedly sustained while sitting on a couch in the firm's reception area); this lawsuit

was pending against the firm at the time of the settlement discussions on November 9, 2004

(12/19/06 hearing tr. at 223:11-224:6).

The Court has considered this record of prepetition litigation solely for the purpose of

better understanding the Co-op's negative perception of Mr. Olsen's character and the setting in

which the settlement discussions of November 9, 2004 took place.  Without question, Mr.

Weiner, who was present throughout these discussions, saw Mr. Olsen as a real and present

litigation threat and wanted to end all litigation with Mr. Olsen as a condition of any settlement.

Mr. Weiner was well aware of Mr. Olsen's pattern and practice of seemingly endless litigation

and, as a condition to any settlement, wanted a release of all claims that extended to 419, its

agent (who had been threatened by Mr. Olsen) and its attorneys (who had been both threatened

and sued by Mr. Olsen).  Mr. Weiner communicated that goal to Mr. Backenroth who functioned

as the principal spokesman for the Co-op during the negotiations.

Five witnesses testified at the evidentiary hearing on December 19, 2006, all of them

attorneys admitted to practice in the Southern District of New York.  Mr. Olsen, although present

throughout the off the record discussions that were the focus of the hearing, did not testify either

on his own behalf or as an adverse witness for the Co-op.[6]  For the most part, the witnesses tell a

consistent story of what transpired during these discussions.  As shown by the transcript of the

hearing held on November 9, 2004, the parties were in court that day for purposes of an

evidentiary hearing on objections filed by the Debtor to the proof of claim of 419.  Prior to

addressing the merits of that claim objection, at the suggestion of Judge Blackshear, the parties

engaged in settlement negotiations during a prolonged recess that started at 11:03 am and ended

at 3:46 pm (11/9/04 hearing tr. at 48:5-6).

The five lawyers and Mr. Olsen met in the hallway and in a conference room near the

bankruptcy courtroom.  All witnesses concur that Mssrs. Greene and Backenroth had the lead

roles in the negotiations, and, at least once, these two lawyers conferred with each other

separately.  These two negotiators were experienced bankruptcy practitioners who knew one

another from prior cases.  Mr. Backenroth had learned about the litigation history from Mr.

---

[6]      Because of Mr. Olsen's decision not to testify as to his personal knowledge of the discussions and as to his
own state of mind at the time, the lawyers who negotiated for their clients provide the only credible evidence
regarding what the parties said to one another in their off the record conversations.  Nonetheless, Mr. Olsen as
advocate for overturning the settlement has made a number of statements in open court regarding his intentions
during the negotiations.  Some of these statements appear to be in conflict with Mr. Olsen's stated goal to set aside
the settlement on grounds of fraud.  For example, during Mr. Olsen's opening statement (12/19/06 hearing tr. at
24:8-13), Mr. Olsen stated his position that the transcript of the hearing on 11/9 accurately set forth the agreement to
release the parties but not agents and attorneys for the parties.  Mr. Olsen seemed to be saying that he believed the
settlement remained valid despite 419's failure to achieve its stated goal of bringing all litigation to an end.  He may
be trying to preserve the benefits of the settlement (reduced 419 claim amount and retention of net sale proceeds of
the apartment) while continuing to litigate with proxies for the Co-op to the financial detriment of the Co-op.  The
Court will not speculate as to his real motives.  Inasmuch as Mr. Olsen's statements were not made under oath, the
Court is disregarding all of his statements for purposes of these findings and conclusions.

Weiner and understood that 419 would only settle with Mr. Olsen if it meant the end of all litigation between the parties (12/19/06 hearing tr. at 132:14-133:6; 135:20-136:7).

With that condition in mind, Mr. Backenroth testified convincingly that he advised Mr. Greene as a threshold matter that the discussions were conditioned, from 419's perspective, on a "global settlement" in which "everyone releases everyone else" and that 419 would not compromise the amount of its claims against the Debtor unless the settlement included an end to all litigation with the Olsens (12/19/06 hearing tr. at 135:20-138:7; 176:4-177:16; 193:5-194:14), or in Mr. Backenroth's words, unless "the bleeding comes to an end" (12/19/06 hearing tr. at 146:2-4). The words "everyone releases everyone else" are the same words used by Mr. Backenroth in his statements describing the settlement that appear on the record of the November 9 hearing (11/9/04 tr. at 49:14-15). Mr. Backenroth acknowledges, however, that the parties never used the specific words "agents" and "attorneys" in any of their discussions, never stated explicitly that the release of 419's agents and attorneys was a requirement of the settlement, nor did the Olsens ever request that agents and attorneys be excluded from the scope of the release (12/19/06 tr. at 187:3-11).

Mr. Backenroth believed that the general language "everyone releases everyone else" was the broadest possible formulation of the intention to release all claims and end all litigation and was comprehensive enough to encompass the release of 419's agents and attorneys. Without an agreement on such a "global" resolution of all litigation with Mr. Olsen, 419 would not have agreed to reduce the amount of its claim nor would it have agreed to permit a distribution of proceeds that were then being held in escrow (12/19/06 tr. at 137:2-16).

Mr. Greene does not specifically recall that the settlement discussions were conditioned at the outset upon a global resolution of all litigation and disagrees with this aspect of Mr.

Backenroth's testimony. In the only variance of any real significance in the testimony of these two central players in the negotiations, Mr. Greene stated that he expected the release to extend solely to the parties and not to agents and attorneys for the parties (12/19/06 tr. at 116:18-25). In his mind, the word "everyone" meant every "party" and the only parties were the Olsens, individually, and the Co-op as a legal entity.

The discussions regarding a possible settlement mostly dealt with the amount of an agreed reduction in the Co-op's claim and how to account for the legal expenses that might be incurred in the future by the Co-op if Mr. Olsen were to prosecute either or both of two state court appeals to the Appellate Division of the New York Supreme Court (12/19/06 tr. at 47:16-48:16; 105:17-23; 138:24-139:15). If Mr. Olsen elected to pursue the appeals, the Co-op would be forced to expend more for counsel fees and reserved the right to seek recovery from Mr. Olsen for these potential future fees. In summary, the settlement, as agreed by the parties, called for: (i) a discounting by 419 of its claim against the Debtor in the approximate amount of $80,000; (ii) an exclusion from the settlement that gave Mr. Olsen the option to pursue two appeals, subject to the right of 419 to seek recovery of additional attorneys' fees incurred in relation to any such appeals; and (iii) "everyone releases everyone else" (without any elaboration at the time as to what was intended by this expression). The agreement, importantly, also provided for certain escrowed proceeds from the sale of the apartment formerly owned by Mr. and Mrs. Olsen to be distributed in satisfaction of various claims, including the compromised claim of 419, with the remainder to be remitted to the Olsens.

The parties to these discussions returned to the courtroom and placed their agreement on the record in a somewhat disjointed fashion. It was late in the day, and the parties recognized that the statements of counsel needed to be further refined and were not yet in final form. Mr.

Greene indicated that he would prepare and submit a proposed order memorializing the agreement of the parties to be entered by the Court at a later date.  Subject to this reserved right to submit a more detailed and more fully considered writing, the transcript of the hearing was "so ordered" by the Court.[7]

As of January 2005, Mr. Greene had not yet circulated a proposed form of order for comment, and so Mr. Backenroth undertook the task of preparing an order to confirm his understanding of the terms of the agreement reached on November 9.  One of Mr. Backenroth's partners sent this proposed order to Mr. Greene in late January.  That is when the parties realized that they had a problem – a fundamentally different understanding as to the scope of the release.  The draft prepared by counsel for 419 provided that the Olsens were releasing 419 and its "agents and attorneys."  When Mr. Greene read the draft and saw this release provision, he called Mr. Backenroth and, among other things, told him that Mr. Olsen would "flip out" when he saw that language (12/19/06 hearing tr. at 121:22-122:2).  Mr. Backenroth remembers the same conversation and specifically recalls the reference by Mr. Greene that Mr. Olsen would "flip out" upon seeing an explicit release of the Co-op's agents and attorneys (12/19/06 hearing tr. at 151:2-3).

Mr. Greene correctly predicted his client's reaction to the order proposed by 419's counsel.  In fact, Mr. Olsen did "flip out" over the release issue and objected to the order.  Despite that objection, Judge Blackshear entered the order substantially in the form submitted by counsel for 419 as the Settlement Order and that has led to Mr. Olsen's multiple motions and appeals, including the current proceedings on remand from the Court of Appeals.  Whether that "flipping out" represented a sincere reaction to an order that identified parties who were never

---

[7]        As discussed on pp. 19-20 below, this outline of the terms of the settlement was binding and enforceable even though it was subject to a further writing.

intended to be covered by the release or whether that "flipping out" was an expedient way for Mr. Olsen to fabricate a means to carry on his fight with 419 by suing surrogates may never be known and is not relevant to the current inquiry.

The fact that Mr. Olsen was opposed to the inclusion of agents and attorneys in the release from the first moment that he learned of the language in the proposed Settlement Order and the fact that Mr. Greene anticipated that this was going to be a serious problem for his client are strong indications that Mr. Olsen never intended the settlement to include a release of agents and attorneys. Conceivably, he listened carefully to the words used on November 9 and cleverly recognized that he could exploit an ambiguity to his advantage and continue litigating against persons he believed had damaged him and his wife. Perhaps he changed his mind after agreeing to the settlement with the knowledge that it was intended to cover 419 and its agents and attorneys. Because Mr. Olsen never testified, his understanding and actual state of mind at the time are not subject to examination.[8]

The most logical conclusion, given that the conversations of the lawyers on November 9 never directly touched upon the specific release of 419's "agents" and "attorneys," is that there was a breakdown in communication and a failure to reach agreement as to the persons who were to be released as part of the settlement. Based on the testimony, the expression "everyone releases everyone else" meant different things to Mr. Backenroth (counsel to 419) and to Mr. Greene (counsel to the Olsens). The terminology used in the negotiations is susceptible to more than one reasonable interpretation, and the parties should have used concrete language to clearly

---

[8]     At the evidentiary hearing, Mr. Olsen claimed that his only understanding of what was discussed during the settlement negotiations was through confidential discussions with his counsel that are protected by the attorney-client privilege (12/19 hearing tr. at 301:1-9). He refused to waive this alleged privilege in order to shed light on his own state of mind at the time of the settlement discussions, in which all witnesses testified he was a participant.

convey their intentions and avoid any misunderstanding as to the parties covered by the release.[9]
Regrettably, that did not occur, although the Court can still harmonize the conflicts in the
testimony regarding the scope of the release.

Despite certain inconsistencies, both Mssrs. Greene and Backenroth were credible
witnesses who assigned different meanings to the same words used in their negotiations. The
Court finds that the negotiators never fully specified a basic deal point (who is to be released)
and that Mr. Olsen did not consent to a separate release of the agents and attorneys for 419. Mr.
Olsen's immediate adverse reaction to the specific release language of the proposed order
supports this finding. The Court also finds that the parties did agree in their discussions,
unambiguously, to end all litigation between 419 and the Olsens except for the possible state
court appeals that might be prosecuted by Mr. Olsen. Mr. Backenroth was emphatic and
persuasive in stating that an end to all other litigation with the Olsens was an essential premise
of, and the starting point for, the negotiations (12/19/06 tr. at 137:2-16). Even Mr. Olsen,
without testifying, has acknowledged in statements made on the record since the remand and by
his conduct that he understood the settlement was supposed to end all litigation with 419. Mr.
Olsen's vigorous, continuing efforts to set aside the settlement on grounds of fraud support this
conclusion as well. He understands that the "so ordered" transcript and the Settlement Order are
designed to prevent further litigation with the Co-op, and that is why he is trying so hard to
vacate the Settlement Order.[10]

---

[9]      In retrospect, it also would have been desirable if the parties had promptly prepared a written stipulation
reflecting the terms of their agreement. Such a stipulation could have been "so ordered" by the Court, thereby
avoiding the current situation in which the Settlement Order includes disputed language.

[10]      This has not prevented Mr. Olsen from continuing to assert claims against the Co-op. Immediately after the
remand, Mr. Olsen demanded that 419 pay him $2 million. *See* November 18, 2006 fax from Mr. Olsen to Ben
Winter, President of 419, admitted into evidence as Exhibit "K".

This leads to the question, discussed in the following section, of whether an end to all litigation with the Co-op can be achieved as a matter of law without also releasing the agents and attorneys who would have indemnity claims against the Co-op, at least as to claims that are not based on alleged fraudulent conduct, willful misconduct or gross negligence.

***Conclusions as to the meaning of "everyone releases everyone else"***

The Court must reconcile the agreement to end all litigation and to release all claims between the Olsens and the Co-op with the fact that the parties did not expressly discuss releasing the Co-op's agents and attorneys. This leads to a review of the characteristics of a New York cooperative apartment corporation and consideration of whether Mr. Olsen can effectively release all claims against the Co-op without releasing claims against the Co-op's agents and attorneys.

The cooperative is a familiar New York institution, notorious for the sometimes arbitrary nature of its governance. Individuals wanting to purchase an apartment are frequently compelled to undergo the scrutiny of a board interview and must be approved by the board as qualified before being allowed to purchase shares in the cooperative corporation and become a tenant in the apartment building owned by the corporation. Unlike a condominium, in which each owner resident has a real property interest in his or her apartment, an owner of a cooperative apartment owns equity in the corporation and has occupancy rights that are described in a related proprietary lease. *Frisch v. Bellmarc Management, Inc.*, 190 A.D.2d 383, 387, 597 N.Y.S.2d 962 (1st Dep't 1993) ("[t]he cooperative corporation is the sole owner of the land, structures and facilities, while the individual shareholder through the proprietary lease receives the right to occupy the space in the premises to which his or her shares are allocated"). The cooperative is a common form of apartment ownership in New York City.

A cooperative apartment building functions more as a residential community than a business. It typically has a superintendent to deal with maintenance, repairs and supervision of staff who work in the building, a managing agent to manage the collection of monthly maintenance, the payment of operating expenses and the transfer of shares, and a board to govern the corporation, establish priorities and endeavor to maintain a high quality of residential life for the benefit of the tenant–shareholders. *See Levandusky v. One Fifth Ave. Apartment Corp.*, 75 N.Y.2d 530, 536 (1990) ("governing boards are responsible for running the day-to-day affairs of the cooperative and to that end, often have broad powers in areas that range from financial decisionmaking to promulgating regulations…"). For tax purposes, the cooperative is a pass through entity that permits shareholders to deduct a ratable share of real estate taxes and mortgage interest expense allocable to the shares held by each resident-owner. *See Chamberlain v. Modular Publications, Inc.*, 99 A.D.2d 433, 434, 470 N.Y.S.2d 399 (1st Dep't 1984) ("chief asset of the corporation is the fee in the underlying real property, which may be and usually is subject to a mortgage. And it is well understood that the purchase of stock in the co-operative corporation will not relieve anyone of the economic burden of the underlying mortgage, that the underlying mortgage and the debt service on that will have to be covered usually by inclusion in the maintenance, and perhaps on maturity of the mortgage by payment of the balance."). As a legal entity, the cooperative corporation provides services through its employees and acts through its managing agent and retained professionals. *See, e.g., Chan v. 1058 Corp.*, 200 A.D.2d 434, 607 N.Y.S.2d 246 (1st Dep't 1994) (lease required building owner to maintain walls of premises; owner's managing agent retained consulting engineer on behalf of owner to provide report which attributed water leakage to wall disrepair).

The cooperative corporation must look to its shareholders for funds needed to cover operating expenses, taxes and debt service.  Ultimately all expenses are passed through ratably to each tenant–shareholder who must bear the financial burden of operations, repairs and improvements, directly by means of paying monthly maintenance or assessments, or indirectly in the form of unsecured or secured borrowings incurred by the corporation.  *See Chamberlain v. Modular Publications, Inc.*, 99 A.D.2d at 434.

The legal expenses that have been incurred by 419 since November 9, 2004, in connection with the ongoing disputes with Mr. Olsen, represent an extraordinary expense, unrelated to repairs or capital improvements that is a source of economic harm to all current shareholders of 419.[11]  Litigation brought by Mr. Olsen against the managing agent or the attorneys for 419, depending on the nature of those claims, may give rise to an indemnity claim against 419 that similarly will result in an extraordinary expense to be allocated among the shareholders.  Given the agreement made by Mr. Olsen to release 419 and end all litigation, such potential claims against the managing agent and the attorneys should not be permitted if such claims would have the effect of imposing any incremental financial burden on the Co-op's shareholders.

Because cooperative apartment corporations act principally through their managing agents (and Mr. Olsen, as a former resident at 419 knows this), a release of the cooperative necessarily must include a release of the managing agent to the extent that the agent is acting in accordance with the applicable managing agreement.  The shareholders cannot be protected from further litigation risks and expenses unless the managing agent is released; otherwise, litigation against the managing agent will yield the collateral damage of indemnity claims that will have to

---

[11]     419 asserts that in excess of $100,000 in legal expenses has been incurred in response to Mr. Olsen's ongoing litigation efforts during the past two years.

be paid by the shareholders. *See* Restatement (Second) of Agency §439(c) & (d); *Admiral Oriental Line v. United States*, 86 F.2d 201, 202 (2d Cir. 1936) (L. Hand, J.) ("An agent, compelled to defend a baseless suit, grounded upon acts performed in his principal's business may recover from the principal the expenses of his defense…The doctrine stands upon the fact that the venture is the principal's…as the profits will be his, so should the expenses."); *Basmajian v. Christie, Manson & Woods Int'l, Inc.*, 629 F. Supp. 995, 998-99 (S.D.N.Y. 1986) ("Where an agent defends a suit arising out of business properly conducted on the principal's behalf, it is black letter law that the agent is entitled to indemnification of its legal fees.").

Mr. Olsen, having agreed to settle with the Co-op, should not be able to pursue claims against the managing agent that have the effect of imposing a financial burden on the Co-op's shareholders. This analysis applies to the Co-op's attorneys as well. *See New York Islanders Hockey Club, LLP v. Comerica Bank-Texas*, 115 F. Supp.2d 348, 351 (E.D.N.Y. 2000) (dismissing contribution claim against law firm because "any culpable conduct by [law firm]…would be attributable to Islanders through agency principles."); *IIG Capital LLC v. Wollmuth Maher & Deutsch, LLP (In re Amanat)*, 338 B.R. 574, 580 (Bankr. S.D.N.Y. 2005) (Bankruptcy Court found it had jurisdiction in case brought by debtor's factor against debtor's attorneys because of the attorneys' potential indemnity rights against the debtor).

There is an exception to the release of claims against 419's agents and attorneys. As noted by the Court of Appeals in *Olsen v. 419 Apartment Corp. (In re Olsen)*, Slip Copy, 2006 WL 3307764, at *1 (2d Cir. Nov. 13, 2006), claims based upon certain causes of action including alleged fraud, intentional misconduct or gross negligence do not create a right to indemnity from the principal and/or client. This means that it is possible for Mr. Olsen to bring claims against the Co-op's agents and attorneys for fraud, gross negligence or misconduct (because these claims

18

were not released) without exposing the Co-op to the risk of potential economic harm. Claims based on other legal theories, to the extent viable, would be barred by virtue of the agreement to end all litigation against the Co-op. The Court concludes that this agreement to release the Co-op extends by operation of law to the Co-op's agents and attorneys, but that the release should be limited to those claims that would give rise to indemnity claims by the agents and attorneys against the Co-op.

In summary, the parties did not agree to a separate release of agents and attorneys but their agreement to end all litigation between the Olsens and the Co-op necessarily amounted to a release of those claims against attorneys and agents that ultimately would pass through as obligations of 419. The language of the Settlement Order appears to have been overly broad in its unqualified inclusion of 419's agents and attorneys as released parties. A modified and more nuanced statement of the legal significance of the parties' agreement would release (i) 419 from all claims and (ii) 419's agents and attorneys from all claims, with the exception of claims based on fraud, gross negligence or intentional misconduct.

### Conclusions as to the enforceability of the settlement

There can be no doubt that the settlement agreement read into the record and "so ordered" by Judge Blackshear is enforceable. The strong, binding nature of settlements made in open court and approved in open court is widely recognized and is understood to be among the most solemn undertakings parties can make before a court. *Nisselson v. Empyrean Inv. Fund (In re MarketXT Holdings)*, 336 B.R. 39, 58 (Bankr. S.D.N.Y. 2006), *citing In re Cuffee*, 232 B.R. 53, 56 (E.D.N.Y. 1999), *Melwani v. Jain,* 2004 WL 936814, at *6 (S.D.N.Y. Apr.29, 2004); *Foster v. City of New York,* 2000 WL 145927, at *3 (S.D.N.Y. Feb.7, 2000). Agreement in an open court stipulation requires all parties to make every effort to abide by and perform every

19

term of such stipulation. *Id. citing Manning v. New York Univ.,* 2001 WL 963982, at *18

(S.D.N.Y. Aug.22, 2001), *Warner v. Rossignol,* 513 F.2d 678, 682 (1st Cir. 1975). The "so

ordered" record at the core of the current dispute, however, includes certain ambiguous language.

In its post-hearing brief, the Co-op argues that the Settlement Order properly interprets

the "on the record" agreement and that Judge Blackshear properly exercised his jurisdiction by

entering the proposed order submitted by the Co-op, because it merely clarified or implemented

the basic agreement put on the record on November 9, 2004 (Respondent's Post-Trial Brief at p.

22). To support this position, the Co-op cites to *Manning v. New York University*, in which the

Second Circuit upheld the District Court's denial of a *pro se* plaintiff's motion to vacate a

settlement agreement. 299 F.3d 156 (2d Cir. 2002), *cert. denied,* 538 U.S. 1035 (2003),

*rehearing denied*, 539 U.S. 984 (2003). In *Manning*, the plaintiff and defendant reached a

settlement in District Judge Buchwald's chambers, the basic terms of which were put on the

record and subsequently memorialized in a settlement agreement negotiated by the parties.

Plaintiff moved to vacate the settlement agreement on the grounds that it contained terms to

which he never agreed, including a "general release."

District Judge Buchwald found, among other things, that denial of Plaintiff's motion to

vacate the settlement agreement was proper because the defendant adamantly insisted on a

general release from the start of the negotiations and plaintiff participated in negotiating the

settlement. *Id.* at 161. In affirming the determination of the District Court, the Court of Appeals

found no clear error in Judge Buchwald's denial of the plaintiff's motion to vacate because "the

interpretations of the release and retiree provisions of the January 30 [in court settlement]

agreement would fall unequivocally within the district court's authority to implement the

framework settlement agreement it endorsed in its January 30, 2001 and March 12, 2001 orders." *Id*. at 164.

While, without question, Judge Blackshear had the authority to implement the November 9, 2004 settlement that was put on the record, the situation before the Court is different from that presented in *Manning*.  In *Manning*, the meaning of the words "general release" were not at issue, only that a general release was a bargained for component of the settlement.  In contrast, the parties in this case dispute the meaning of the words used to describe the scope of the release. Nobody disputes what was said, only what was meant.  Importantly, the parties' negotiations did not take place in Judge Blackshear's chambers or in his presence and, unlike Judge Buchwald; Judge Blackshear did not act directly as an intermediary to resolve the dispute.  As such, he was not in a position to interpret the words "everyone releases everyone else" when he entered the Settlement Order.

The Court concludes that the use of the language "agents and attorneys" in the Settlement Order represented an appropriate implementation of the November 9 oral settlement agreement provided that the release of agents and attorneys includes an exception for fraud, intentional misconduct and gross negligence.

### Recusal Motion

Filed by Mr. Olsen on December 15, 2006, as a litigation tactic in connection with this remand, the Recusal Motion alleges bias, lack of impartiality and "deep-seated antagonism" due to a number of adverse rulings I made dating back to March, 2006 denying a variety of Mr. Olsen's discovery and procedural motions.  These rulings are not the by-product of any extrajudicial bias or legally cognizable lack of impartiality within the meaning of 28 U.S.C §

455.[12]  The allegations in the Recusal Motion are so far fetched that they are damaging to Mr.

Olsen's own credibility (which he shielded from direct challenge by choosing not testify during

the evidentiary hearing).  The Court believes that the Motion was ill-advised and may have been

an attempt by extreme means to obtain an adjournment of the evidentiary hearing.

*28 U.S.C § 455*

Under 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate of the United States shall

disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

A judge must disqualify himself "[w]here he has a personal bias or prejudice concerning a party"

in the case before the court.  28 U.S.C. § 455(b)(1).  The test to determine if recusal is warranted

is objective: "whether a reasonable person knowing and understanding all of the relevant facts

would recuse the judge."  *In re Drexel Burnham Lambert, Inc.,* 861 F.2d 1307, 1313 (2d Cir.

1988), *cert. denied,* 490 U.S. 1102 (1989); *see also In re IBM Corp.,* 45 F.3d 641, 643 (2d Cir.

1995) (same); *S.E.C. v. Grossman,* 887 F. Supp. 649, 658 (S.D.N.Y. 1995) (same).  "The alleged

bias and prejudice must stem from an extrajudicial source and result in an opinion on the merits

on some basis other than what the judge learned from his participation in the case."  *United*

*States v. Grinnell*, 384 U.S. 563, 583 (1966); *accord Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d

1138, 1141 (2d Cir. 1994).

Adverse judicial rulings alone almost never constitute a valid basis for a recusal motion.

*Liteky v. United States*, 510 U.S. at 554 (*citing United States v. Grinnell*, 384 U.S. at 583).

Rather, to warrant recusal, a judge's comments or opinions must display a "deep-seated

favoritism or antagonism that would make fair judgment impossible."  *Liteky v. United States*,

---

[12]    Mr. Olsen also sought my recusal pursuant to 28 U.S.C. § 144, which applies to the disqualification of
District Court judges on the grounds of bias or prejudice.  28 U.S.C. § 144 does not apply to bankruptcy judges, but
the standards for disqualification under §§ 144 & 455(b)(1) are the same.  *In re Teligent, Inc.*, 2005 Bankr. LEXIS
125, at *6, n7 (Bankr. S.D.N.Y. Feb. 3, 2005) *citing Dubnoff v. Goldstein*, 385 F.2d 717, 720 (2d Cir. 1967); *Liteky*
*v. United States*, 510 U.S. 540, 548 (1994).

510 U.S. at 555.  Judges may, however, properly form both negative and/or positive opinions about the parties before them on the basis of facts introduced or events occurring during the case, and such opinions are, especially in the case of a bench trial, necessary to rendering decisions. *Id.* at 551 ("The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person.  But, the judge is not thereby recusable for bias or prejudice…'Impartiality is not gullibility.  Disinterestedness does not mean child-like innocence.'" (*quoting In re J.P. Linahan, Inc.*, 138 F.2d 654 (2nd Cir. 1943)).

Evidently with the *Liteky* case in mind, Mr. Olsen filed supplemental papers in support of his Recusal Motion on December 18 alleging that I have shown deep-seated antagonism toward him.[13]  The allegations made in this supplemental filing are entirely lacking in support, utterly false and offensive.  My comments at the outset of the hearing on December 19 are indicative of my views regarding the Recusal Motion (12/19/06 hearing tr. at 4:12-14:15).  Mr. Olsen deliberately has made untrue and provocative statements with the apparent goal of creating controversy, baiting the Court and fabricating issues for possible appeal.

*Timeliness of Recusal Motion*

The Recusal Motion was untimely, having been made after the scheduled starting time of the evidentiary hearing.  A motion to disqualify must be made, "at the earliest possible moment" after obtaining information of possible bias to preserve judicial resources and prevent a litigant from hedging its bets against the eventual outcome.  *United States v. Yonkers Bd. of Educ.,* 946 F.2d 180, 183 (2d Cir.1991) (citing *Apple v. Jewish Hosp. & Medical Ctr.,* 829 F.2d 326, 333 (2d

---

[13]     Given the reckless and false statements made by Mr. Olsen for the evident purpose of molding his allegations to the "deep-seated antagonism" test of *Liteky*, the Court has first-hand experience with Mr. Olsen's unrestrained litigation tactics and is concerned that he may do the same thing in pursuing litigation against 419's agents and attorneys by framing his allegations to fit the exceptions to the release described in this decision, regardless of the merits.

Cir.1987)); *see also Polizzi v. United States,* 926 F.2d 1311, 1321 (2d Cir.1991) (noting that, while § 455 does not contain an explicit timeliness requirement, the courts have read such a requirement into the provision).

*Impartiality*

None of the judicial actions identified in the Recusal Motion were the result of unfair bias or prejudice. The Court's findings and conclusions to date have been based solely on impartial consideration of each of the matters presented by the litigants. Any allegation to the contrary is unsupportable both as a matter of fact (I have no such claimed bias in favor of 419) and as a matter of law (there is no improper connection between myself and any party to this bitter and protracted feud between 419 and Mr. Olsen, including 419's lawyers and agents, and no such connection has even been alleged).

The Recusal Motion fails to cite any objective basis for finding bias and omits any mention of those occasions when the Court actually sided with Mr. Olsen in motions and informal requests made at his urging. For example, at the hearing held in March with respect to Mr. Olsen's motion to set aside his settlement with 419 on grounds of fraud, 419 sought an order of the Court to prevent Mr. Olsen, based on his history of relentless litigation, from filing any pleadings against 419 without prior approval of the Bankruptcy Court. The Court refused to grant that relief. 419 later filed a separate motion for sanctions against Mr. Olsen in August 2006, which the Court also denied.

At the status conference held on November 21, 2006, the Court granted Mr. Olsen's request to take depositions before the evidentiary hearing, over the objection of 419, finding that some discovery was appropriate even though Mr. Olsen, as a participant, had first-hand knowledge of the settlement discussions. The Court limited such discovery to the issues

presented in the remand and admonished the parties to focus their discovery on relevant issues. The Court also refused to grant an oral motion made by 419 that Mr. Olsen be directed to refrain from contacting the Court with procedural questions relating to the remand, noting that Mr. Olsen, like all other parties, had the right to ask such questions.

Mr. Olsen does not mention these occasions when the Court ruled in his favor and, as a consequence, tells a version of the procedural history that the Court knows is one-sided and distorted. But even if the Court's rulings had been uniformly adverse to him, that would not constitute cause to seek my recusal.[14] The Court is charged with the responsibility of making independent rulings based on its consideration of the applicable facts and law. No litigant has the right to shop for a judge that he thinks may be more sympathetic to his cause or more favorably disposed to his arguments, nor does any litigant have the right to misuse for short-term tactical advantage recusal statutes that are meant to assure the public that the federal judiciary is impartial. *Ex parte American Steel Barrow Co.*, 230 U.S. 35, 44 (1913) (recusal statute "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made…").

Taken together, Mr. Olsen's letters requesting relief, numerous motions, requests for reconsideration and appeals are characteristic of vexatious litigation. Acting on his own (with the occasional disclosed assistance of a lawyer who never signs a pleading or exposes himself directly to Rule 11 scrutiny or sanctions), Mr. Olsen prepares and files often lengthy submissions with citations to statutes and case authority that require response by 419 and that have called for

---

[14]    It should be noted that following Mr. Olsen's unsuccessful efforts to set aside the settlement in March, he wrote a letter to the Chief Judge of the Bankruptcy Court requesting reassignment of this case to another judge. That request was not based on alleged bias, but rather on my claimed lack of familiarity with the background of Mr. Olsen's dispute with 419 and was denied. Mr. Olsen has been pushing for reassignment since our very first encounter.

judicial action at every level of the federal judicial system with the exception of the United States Supreme Court. He is relentless.

Mr. Olsen's motives in pursuing this tireless campaign against his former Co-op are not the subject of this decision, but his actions are part of the landscape of the case and cannot be ignored. The Court has every right, indeed it has the obligation, to assess the credibility of the parties who appear and testify in contested matters before it. *Liteky v. United States*, 510 U.S. at 551. The adverse rulings about which Mr. Olsen complains in each instance are the result of the Court's weighing the merits of each motion and are not influenced at all by any bias that would justify recusal.

Mr. Olsen may be a gadfly and his motives may be suspect, but that has not caused the Court to rule against him in the past on account of bias, nor does it mean that the Court has been unable to act as an impartial fact finder in evaluating the issues presented by the remand from the Court of Appeals. The Recusal Motion has not influenced the findings and conclusions with respect to the remand set forth in this memorandum decision.

While not directly related to disposition of the Recusal Motion, one aspect of Mr. Olsen's recent conduct is very troublesome and worthy of particular comment. On December 4, the court convened a telephone conference with Mr. Olsen and Slava Hazin, counsel for 419, for purposes of helping to resolve a discovery dispute. The conference was scheduled because Mr. Olsen wanted to file a motion to compel discovery and to resolve certain disputes regarding proposed depositions. Such conferences are described in Local Bankruptcy Rule 7007-1 and are for the purpose of endeavoring to resolve discovery disputes without formal motion practice and argument on the record and, thus, are not transcribed. Nevertheless, the Recusal Motion discloses that Mr. Olsen, without the permission or knowledge of the Court or his adversary,

recorded that informal telephonic discovery conference and cited to a transcript of it in subsequent pleadings.

Mr. Olsen's concealed recording of our telephone conference without notice or my permission to do so reveals that he was transcribing comments by the Court for his own purposes. The surreptitious recording of any judge of this Court violates Local Bankruptcy Rule 5073-1, which prohibits "the use of recording devices in a courtroom or its environs, except by officials of the Court in the conduct of the Court's business…" By taping a telephone conference in which I participated from my chambers, Mr. Olsen has used a recording device in the environs of the courtroom.

Mr. Olsen wrongly has analogized his secret taping of what was effectively a settlement discussion of discovery disputes to the sound recording that occurs in court proceedings and constitutes the official record. Such in-court recordings are made with the authorization of the Court and those speaking have the expectation that their words will become part of the record and may potentially be used in later proceedings. There is a fundamental difference between the informality of a discovery conference and formal, recorded court proceedings.

Mr. Olsen may argue that he did not know he was doing anything improper, that he was recording the conversation to make sure that he had an accurate record of what transpired during the discovery conference and that he deserves special consideration because of his *pro se* status. That kind of explanation is not compelling given Mr. Olsen's extensive experience as a lay litigator and the fact that he admits to having consulted with counsel in connection with his drafting and filing of various submissions to the Court. If Mr. Olsen were an attorney, his conduct would violate DR-102(A)(4), which requires that a lawyer not "engage in conduct

involving dishonesty, fraud, deceit, or misrepresentation."[15]  He is not being held to professional

standards applicable to practitioners, but he is sophisticated enough to know that the taping of a

judge during a telephone conference without prior disclosure, regardless of any rule, simply is

the wrong thing to do.

The Court denies the Recusal Motion for the reasons stated on the record (*see* 12/19/06

hearing tr. at 4:12-14:15) and in this memorandum decision.  Mr. Olsen has failed to show any

grounds for my recusal and has wrongly accused the Court of siding with his adversary.  Despite

the vexatious aspects of the Recusal Motion, the Court considers the Recusal Motion to be

irrelevant to the determination of the issues remanded for determination.  That motion is not,

however, irrelevant to the imposition of sanctions against Mr. Olsen.

### Sanctions Against Mr. Olsen

Mr. Olsen's former attorney, A. Mitchell Greene, described him as an "astute" client.

The Court agrees with that assessment.  Mr. Olsen is simply too astute and too purposeful in his

actions to be viewed as an ordinary *pro se* litigant.  He is well aware that his actions have

consequences and fully understands that his letters and motions, regardless of how

unsubstantiated and far-fetched, cause 419 to respond and to incur legal fees.  Mr. Olsen uses his

*pro se* status as a weapon empowering him to make scandalous allegations without having to pay

a lawyer or abide by the ethical standards applicable to lawyers.  He pleads an asserted inability

---

[15]      The ABA Committee on Ethics and Professional Responsibility has determined that "[t]he conduct proscribed in DR 1-102(A)(4) ... clearly encompasses the making of recordings [of conversations] without the consent of all parties."  ABA 337 (1974).  Therefore, the ABA has concluded that, absent "extraordinary circumstances ... no lawyer shall record any conversation whether by tapes or other electronic device, without the consent or prior knowledge of all parties to the conversation."  *Id.*  Similarly, ethics committees in New York have concluded that even if a lawyer's secret electronic recording of a conversation is not illegal, "it offends the traditional high standards of fairness and candor that should characterize the practice of law and is improper except in special situations ... ."  N.Y. State 328 (1974); *see also* New York City 80-95 (1982) (recording conversations with lawyer's clients and recording of conversations in civil litigation prohibited).

to pay for litigation while apparently delighting in creating multiple opportunities to expose 419 to ongoing expense.

There may be no obvious immediate remedy to right this perceived wrong, but the Court does have the ability and the duty to impose appropriate sanctions against Mr. Olsen for his (i) filing of a Recusal Motion, so lacking in merit that it could not possibly have been filed in good faith, and for the improper purpose of delaying the start of the evidentiary hearing, (ii) impermissibly recording a discovery conference and (iii) willfully refusing to comply with this Court's direction that he pay for one-half of the cost of transcribing the record of the hearing held on December 19, 2006. The sanctions to be imposed are grounded in two separate theories. First, it is clear from the timing and the substance of the Recusal Motion that it was filed for an improper purpose, and as such the filing is sanctionable under Fed R. Bank. P. 9011(b). Second, Olsen's willful violations of direct orders and rules of this Court are sanctionable under theories of civil contempt.

419's counsel has incurred legal expenses relating to the Recusal Motion that included (i) preparation of a response to that motion and (ii) appearing for a hearing on December 15 that was adjourned as a result of the last minute filing of the motion. Mr. Olsen should compensate 419's counsel for the reasonable value of the time spent as a direct response to the Recusal Motion. Additionally, despite the Court's direction that the parties share equally the cost of transcribing the hearing held on December 19, Mr. Olsen willfully refused to contribute his share with the result that 419 has paid for the entire cost of the transcript.

419 shall settle an order on Mr. Olsen imposing sanctions against him in an amount equal to the sum of (i) the actual legal fees and expenses incurred as a direct consequence of Mr. Olsen's filing of the Recusal Motion and (ii) fifty percent of the actual cost of the hearing

transcript.  The secret recording by Mr. Olsen violates the Local Rules of this Court but shall not result in the imposition of any additional monetary sanctions.

### *Conclusion*

As directed by the remand, this Court has considered the evidence presented at the hearing held on December 19, 2006 and has determined that the Settlement Order is consistent with the settlement discussions among the parties provided that the release of claims against "agents" and "attorneys" does not apply to claims based on fraud, intentional misconduct or gross negligence.  Any appeal to the District Court from the findings and conclusions of this decision shall be assigned to Judge Castel as provided in the mandate of the Court of Appeals.

Dated:  New York, New York
      January 5, 2007

*s/ James M. Peck*
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY COURT